UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT J. DERMODY III, | Case No. 16-cv-8632 |
| Plaintiff, | Civil Action |
| v. | **JURY TRIAL DEMANDED** |
| SYMBIONT.IO, INC., CAITLIN F. LONG, NEIL DESENA, SHIVAN GOVINDAN, DUNCAN NIEDERAUER, ABC COMPANIES 1-10 and JOHN and JANE DOES 1-10, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff Robert J. Dermody III ("Dermody"), as his Complaint, says as follows:

### Introduction

1)      This matter arises from a Restricted Stock Purchase Agreement ("Agreement") among the founders and other employees of a start-up financial technology company known as Symbiont.io ("Symbiont"), as well as an employment agreement between Plaintiff Dermody and Symbiont.  Symbiont was founded in February 2015 to develop computer technology to model complex financial instruments using distributed ledgers similar to those on which the Bitcoin electronic currency system is based, enabling financial transactions to settle more quickly and with better security.  Dermody and two other founders had developed similar technology on an open-source project with an associated non-profit foundation entity known as Counterparty, and Symbiont originally planned to use the Counterparty technology for the Symbiont product. Symbiont agreed that Dermody would continue to participate in and contribute to Counterparty's development activities while employed by Symbiont.

2)      Plaintiff Dermody was one of four founders of Symbiont. On joining Symbiont,

Dermody executed the Agreement that entitled him, among other things, to purchase 5,105,208 shares of Symbiont stock for $1.00.  The Agreement, as amended, provided that Dermody's shares would vest over a three year period, and that Symbiont would have the right to repurchase certain shares, on a declining schedule, for up to six months after Dermody's employment terminated.

3)      Dermody voluntarily resigned from Symbiont effective June 1, 2016 for health reasons.  At that time, Dermody held 2,158,318 shares of Symbiont that had vested and been released from eligibility for repurchase by Symbiont, and 2,158,318 additional shares that had not yet vested.

4)      During June 2016, Dermody negotiated with Symbiont regarding the terms of a separation agreement.  Points at issue included Dermody's ongoing role as an adviser to Symbiont and the scope and nature of his continued involvement with Counterparty.  On July 15, 2016, however, Symbiont abruptly revoked its previous proposals and declared unilaterally and improperly, without any basis whatsoever, that Symbiont deemed Dermody to have been terminated for cause "prior to the first vesting date set forth in" the Agreement, and announced that Symbiont would repurchase 4,066,636 shares of Dermody's Symbiont stock and permit him to retain only 250,000 shares.  The purported retroactive termination for cause was entirely pretextual, in that all the actions complained of had been disclosed to and ratified by Symbiont without objection and had in fact been approved in advance.  The purported retroactive termination for cause at an unspecified date "prior to the first vesting date" for Dermody's Symbiont shares was obviously made for the sole and bad faith purpose of depriving Dermody of his Symbiont shares to which he is entitled by virtue of the Agreement.

5)      Dermody seeks relief against the Defendants for breach of contract and breach of

the covenant of good faith and fair dealing (relating both to the Agreement and the employment agreement), constructive trust, specific performance and declaratory judgment.

### Jurisdiction and Venue

6)      Jurisdiction over this matter resides in this Court pursuant to 28 U.S.C § 1332 in that there is complete diversity of citizenship among the parties and the amount in controversy exceeds the statutory jurisdictional threshold.

7)      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant Symbiont resides in New York County and a substantial part of the events complained of occurred within the Court's jurisdictional territory.

### Parties

8)      Plaintiff Dermody is an individual who is a resident and citizen of North Carolina.

9)      Defendant Symbiont is a Delaware corporation with offices at 25 Broadway, New York, New York.

10)      Defendant Caitlin F. Long ("Long") is the Chairman of the Board and President of Symbiont.

11)      Defendant Neil DeSena is a member of the Board of Directors of Symbiont.

12)      Defendant Shivan Govindan is a member of the Board of Directors of Symbiont.

13)      Defendant Duncan Niederauer is a member of the Board of Directors of Symbiont.

14)      ABC Companies 1-10 and John and Jane Does 1-10 are individuals whose identity is unknown who participated in the events complained of herein and who caused damages to Plaintiff Dermody.

### Background

15)      In or about December 2014, Plaintiff Dermody approached Mark Smith and

began to work with Smith and Evan Wagner to form Symbiont.  Dermody and Wagner, along with Adam Krellenstein, were the founders of Counterparty, and Smith was employed by another financial technology development company known as MathMoney f(x).

16)     Counterparty is an open source project with an associated non-profit foundation founded by Dermody, Krellenstein and Wagner to develop computer technology on an open-source basis to extend the Bitcoin technology to support "smart contracts" and other innovations enhancing the efficiency, flexibility and security of financial transactions using the distributed ledger technology on which Bitcoin is based.  Counterparty has no budget or income, and is funded entirely by contributions from the founders and donations from the community.

17)     In early 2015, Dermody worked to hire software designers and developers for the proposed Symbiont venture while Smith, as Symbiont's CEO, worked on raising seed capital to fund the proposed start-up.  Dermody also prepared initial requirements and design documentation for the Symbiont "smart securities" system and implemented software, to be owned by Symbiont, to permit the Counterparty network to interface with the popular Ripple blockchain settlement system, as approved by Mark Smith and in accordance with Symbiont's thoughts and strategy at the time.  Among others, Dermody and Wagner recruited Counterparty personnel including Krellenstein, Counterparty developer Ouziel Slama and Counterparty General Manager Ivana Zuber.  These Counterparty personnel, along with Dermody and Wagner, constituted the entire "brain trust" of Counterparty, responsible for virtually all ongoing Counterparty development and operational duties at the time, and recruiting them for Symbiont lent substantial credibility to the Symbiont project within the "blockchain" financial technology community, due to Counterparty's highly regarded reputation and connections. After the recruitment of Krellenstein, Dermody transitioned to the role of President of Symbiont, with

Krellenstein moving into the CTO role. Dermody's new role of President was progressively more removed from the company's software development process, and did not directly involve developing out Symbiont's software code.

18)   In March 2015, Dermody and Symbiont entered into the Agreement which provided, among other things, that Dermody was permitted to purchase 5,105,208 shares of Symbiont stock for $1.00.  Smith executed the Agreement on behalf of Symbiont.  Dermody purchased the shares and on September 28, 2015, Dermody voluntarily sold 788,572 shares to Krellenstein for a total of $788.00 to make Krellenstein's share ownership comparable to that of Dermody, Wagner and Smith.  Dermody then owned 4,316,636 shares of Symbiont stock.

19)   As amended in April 2015 and again on September 28, 2015, the Agreement provided that Dermody's Symbiont shares would vest over a three-year period such that 50% of his 4,316,636 shares, or 2,158,318 shares, would vest on February 1, 2016; 25% of his shares, or 1,079,159 shares, would vest on February 1,2017; and the remaining 25%, or 1,079,159 shares, would vest on February 1, 2018, and Symbiont's right to repurchase the shares would terminate on the vesting date for each block of shares.

20)   It was understood and agreed by Smith, the CEO, on numerous occasions, including explicitly stated in a call between Smith, Dermody, Krellenstein and Wager in late summer 2015 that Dermody, Krellenstein and Wagner could continue to support Counterparty and the development of its open-source platform while serving as employees of Symbiont, and that such activities for Counterparty were not competitive with or inimical to Symbiont's proposed development and marketing, as long as Dermody, Wagner or Krellenstein did not contribute to or enhance pre-existing "smart contract/EVM" technology for Counterparty, which resembled capabilities being developed on a proprietary basis by Symbiont. In accordance with

this, both Dermody and Krellenstein made updates to the Counterparty source code during 2015.

21)     After Krellenstein became Symbiont's Chief Technology Officer, Symbiont's technology focus began to move away from the Counterparty platform and Symbiont began to develop its own proprietary technology.  As this occurred, Dermody scaled back his involvement with Counterparty and restricted his involvement with Counterparty to those activities necessary to maintain Counterparty.

22)     During the summer and fall of 2015, Dermody continued to spend, on average, only 4-5 hours per week on Counterparty activities, in accordance with commitment levels that were communicated between Smith, Symbiont counsel and Dermody during Dermody's employment contract negotiations.  Dermody's activities included numerous bug fixes, and code that helped to address stability issues identified by spam attacks on the underlying Bitcoin network.  In the fall of 2015, Dermody handed off the vast majority of his Counterparty development work off to another developer (not affiliated with Symbiont) that he brought in to replace the contributors who had been hired away from Counterparty by Symbiont, and restricted his involvement in Counterparty even further.

23)     During this same period in the spring, summer and fall of 2015, Dermody spent all but a few hours per week of his time on Symbiont activities, including the following:

a.   worked with a bond expert to design a new bond origination and trading platform for Symbiont, and wrote several hundred pages of product documentation in that process;

b.   developed dozens of pages of technical and product documentation;

c.   generated most of the textual content for, and oversaw the creation of, the Symbiont website;

    d.   worked with other Symbiont personnel to secure numerous prospective customer deals as they materialized (e.g. State Street, Allianz, etc.);

**Dermody's Health Issues**

24)    In late 2015 and early 2016, Dermody developed serious health issues and worsening of certain life-long chronic conditions for which he had long undergone treatment including surgery.  Despite these health issues, Dermody agreed at Smith's request to move from North Carolina to New York so he could be at Symbiont's offices full-time.  Before moving to New York in early January 2016, Dermody had travelled to New York from North Carolina a few days every few weeks, and then a few days every week.

25)    Shortly after moving to New York, Dermody was diagnosed with a congenital immune system condition as well as an antibiotic-resistant sinus infection.  Dermody's condition was exacerbated by his exposure to mold and other allergens in the subway as well as the older buildings in which he was living and working in New York.  With the consent of Smith, Dermody negotiated a change in his duties that permitted him to move to North Carolina, where he had previously lived.

26)    Dermody's new duties included serving as COO of the incipient joint venture between Symbiont and Ipreo, a financial solutions provider with a major presence in Raleigh, North Carolina.  Dermody continued to perform his duties for Symbiont from North Carolina. The joint venture's initial progress was slow because of protracted legal negotiations regarding its formation, which were almost exclusively being performed by Mark Smith and Symbiont counsel, and which prevented Dermody from getting started in earnest on the technology development the venture was being formed to do.  Dermody also found he was less effective in his work for Symbiont, due both to the persisting health issues, as well as the challenges involved in working remotely, from North Carolina, given Symbiont's increasingly New York

City-based office culture.  Dermody therefore gave notice to Smith on March 23, 2016 that he

was resigning.

### Negotiation of Terms of Separation

27)     Smith asked Dermody to stay on to effect a transition, and by agreement with

Smith, Dermody worked for Symbiont until June 1, 2016.

28)     In discussions with Smith, Dermody agreed to stay on as an unpaid adviser to

Symbiont after his termination date.  Dermody and Smith also agreed that Dermody would

become more involved with Counterparty in a "behind the scenes" fashion.

29)     Dermody handed off his technical and business duties to others at Symbiont as

agreed to facilitate a smooth transition.

30)     Throughout his employment at Symbiont, Dermody coordinated his work for

Counterparty with Smith.  For example, on March 6, 2016, Dermody e-mailed Smith to advise

him of a proposal to add the aforementioned "smart contract/EVM" capabilities to Counterparty,

which, due to recent developments in the field, Dermody and Krellenstein now believed could

also be useful to Symbiont.  In a responsive e-mail, Smith stated he believed Symbiont should

not use Counterparty code in this area, and Dermody, Krellenstein and Wagner should not be

publicly associated with the development, but explicitly allowed development of the EVM to

move forward and stated that "you can feel free to work behind the scenes." In addition, after

being notified of Dermody's intent to resign, Smith expressed on numerous occasions a

willingness and intent that Dermody be able to keep working on Counterparty.

31)     On June 18, 2016, consistent with discussions in June, Symbiont's attorney sent

Dermody a draft separation agreement.  In Section 1 of Symbiont's first draft, the proposed

agreement provided, in part, "Notwithstanding the terms of Section 12 of Employment

Agreement, the Company has agreed to permit you to serve as Chairman of Counterparty

Foundation, [a registered 501c3 non-profit organization] ("Counterparty"), and to perform

certain activities for Counterparty, in each case on the terms set forth on Schedule I hereto."

32)     Symbiont's proposed first draft provided further that Symbiont would repurchase

2,676,313 of Dermody's 4,316,636 shares, and an additional 201,445 shares would be subject to

repurchase by Symbiont until the one-year anniversary of the effective date of the Agreement, to

be released provided Dermody complied with his continuing obligations.  In other words,

Dermody would retain 1,438,878 Symbiont shares without the possibility of repurchase by

Symbiont, and he would receive an additional 201,445 shares on April 15, 2017 (bringing his

total shares to 1,640,323) provided he complied with his obligations to Symbiont.

33)     Dermody and Symbiont's attorney exchanged numerous drafts and comments.

During this process, Dermody pointed out that the reference to Counterparty as "a registered

501c3 non-profit organization" was technically inaccurate because Counterparty had never

completed the process of registering the company with the IRS as a 501(c) entity, although it had

been formed as a Delaware non-profit corporation, and its bylaws clearly and explicitly stated its

non-profit intent.

34)     Dermody also proposed that the separation agreement should provide that

Symbiont would issue Dermody a certificate for his Symbiont shares.

35)     Almost a month after the first proposed separation agreement had been sent to

Dermody, on July 14, 2016, Smith e-mailed Dermody, stating that he had become "unsettled" by

Dermody's proposed changes to the separation agreement.  In particular, Smith said, in response

to the proposed correction of the language regarding Counterparty:

> The big problem is the deletion of the registered non-profit status
> of Counterparty and the Counterparty Foundation.  This is highly
> relevant and the basis of our agreement not to view it as a
> competitor, if it is not a legal not for profit then we have no choice

but to view it as a direct competitor and restrict you from participating in any way or risk the loss of all your equity.  Please update me as to the legal status of Counterparty so we know how to proceed.

36)    In a responsive e-mail on July 14, 2016, Dermody replied,

The non-profit change was purely due to the fact that the 501c3 documentation was never fully completed (due to costs, complexities… I can get this ball rolling with my CPA if needed since Perkins Coie never finished it).  We can change the phrasing to "not for profit", I just took it out because it wasn't technically a 501c3.

I can delete all confidential information if needed…that was the only intent of the adviser bit, as being on Slack for instance I naturally am exposed to such information. This really comes down to what Symbiont is comfortable with.

I have the feedback on the doc from the attorneys.  Do you have an hour so you and I can interactively walk these points and their suggestions, and then we can put this to bed?  Trust that I'm not trying to change the material terms of the situation here, and want to get this closed out as much as you do."

37)    On or about July 19, 2016, Smith called Dermody and informed him that the Symbiont board now considered Counterparty a direct competitive threat, and requested that Dermody cease further work on Counterparty during his non-compete period. In return, Smith informed Dermody that Symbiont would not contest his retention of the vested shares. Dermody told Smith that he would consider Symbiont's new position and get back to him.

38)    On July 26, 2016, Dermody e-mailed Smith to propose that after a three week transition, Dermody would withdraw from any work for Counterparty for twelve months, provided Symbiont waived any claims that the work Dermody had already performed for Counterparty constituted a violation of any duty by Dermody.

39)    On July 29, 2016, Smith responded, "Rob Odell [Symbiont's attorney] has been added to this email chain.  I have been advised by counsel that since you have engaged an

attorney for these negotiations I can no longer be in direct communication with you about terms.

Rob will be following up with the company's response to your counter."

### Symbiont's Purported "Retroactive" Termination of Dermody for Cause

40)     On August 15, 2016, Symbiont's attorney e-mailed Dermody, stating in relevant

part as follows:

> The lengthy discussions about your separation from Symbiont have
> caused the Company to take a deeper look at your actions while
> you were employed.  The Board of Directors has concluded that
> your actions while you were employed at the Company were
> sufficient to deem your employment terminated for cause prior to
> the first vesting date set forth in the Restricted Stock Purchase
> Agreement between you and the Company, as amended.
>
> Specifically, the Company has concluded that (i) you violated your
> obligation to devote your full working time and attention to the
> business of the Company, (ii) you developed intellectual property
> for Counterparty during your employment with the Company
> without the Company's consent and (ii)[sic] you disclosed the
> Company's confidential information to third parties.  While we
> understand you disagree, the Company also believes that these
> actions may have violated your non-competition obligations set
> forth in your employment documents.  Moreover, the Company
> believes that you mis-represented Counterparty's status as a non-
> profit organization to the Company at the outset of your
> employment – as we have discussed over the past few months,
> Counterparty is not in fact registered with the IRS as a tax-exempt
> non-profit.  Each one of the foregoing actions violates the terms of
> your employment offer letter and the Non-Disclosure Agreement
> and Agreement regarding Ownership of Intellectual Property.
>
> These issues have harmed Company's development and
> fundraising efforts, and had they been fully understood earlier, the
> Company would have taken measures to terminate your
> employment at that time.  Indeed, the Company has noticed, by
> way of example, that while you have repeatedly made code
> commitments to Counterparty over the past 18+ months, you have
> made no contributions to Symbiont's software, and the that[sic]
> tasks within your purview with respect to the Company's joint
> venture with Ipreo were not performed in a manner that would be
> expected of the future COO of the JV (which has contributed to the
> issues facing that transaction).

> *Accordingly, the Company hereby revokes all prior offers made with respect to your departure from the Company.*
>
> Subject to your executing the Company's standard Separation Agreement and Release and not revoking your signature, the Company is prepared to permit you to maintain ownership of 250,000 of the 4,316,636 shares of Common Stock held by you pursuant to the Restricted Stock Purchase Agreement.  The Company will be repurchasing the remaining 4,066,636 shares for $0.001 per share.  The Company will waive the non-compete obligations  set forth in your employment offer letter with respect to your current work[sic] Counterparty, provided in each case that you do not directly or indirectly perform any work related to "smart securities" through April 30, 2017.  The Company will not object to your buying and selling XCP during this time.

(Emphasis added).

41)     Since the August 15, 2016 e-mail, discussions between Dermody and Symbiont have broken down.

42)     Symbiont's stated decision to retroactively "deem [Dermody's] employment terminated for cause prior to the first vesting date" is wholly improper, without any legal basis, and pretextual with the aim to wrongfully deprive Dermody of his ownership interest in 2,158,318 shares of Symbiont stock.  The claimed reasons for termination are also untrue, contradicted by statements of Smith and others at Symbiont, and asserted in bad faith.

43)     Clearly Symbiont's stated decision to "deem" Dermody's employment terminated for cause retroactively is motivated solely by the desire to wrongfully deprive Dermody of his Symbiont shares, in violation of Dermody's rights under the Agreement.

**Symbiont's Bad Faith Failure to Pay an Agreed Bonus on Closing of Series A Funding**

44)     Dermody's employment agreement provided that Dermody would receive a $30,000.00 increase in his annual salary on closing of Symbiont's Series A funding round.

45)     Dermody's employment agreement provided that Dermody would receive a one-time $30,000.00 bonus payable within ten days of the closing of Symbiont's Series A funding

12

round.

46)     On information and belief, Symbiont's Series A funding round closed in

December 2015.

47)     Symbiont never increased Dermody's salary, as agreed, despite the fact that such

increase was earned on the closing of the Series A funding round.

48)     Symbiont never paid Dermody the agreed $30,000.00 bonus despite the fact that it

became due and payable ten days after the closing of the Series A funding round.

49)     Symbiont never paid Dermody the company's standard moving allowance of up

to $10,000.00 to reimburse him for relocating from North Carolina to New York, or for

relocating back to North Carolina.

50)     As a direct and proximate result of the actions of Symbiont and its Directors,

Dermody has suffered damages.

## FIRST COUNT
### (Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing)

51)     Plaintiff Dermody repeats the allegations of the preceding paragraphs as if set

forth here at length.

52)     Plaintiff Dermody and Symbiont, with the approval of Symbiont's Board of

Directors, entered into the Agreement pursuant to which Dermody was entitled to purchase

5,105,208 shares of Symbiont stock for $1.00.

53)     Dermody owned 4,316,636 shares of Symbiont stock as of September 28, 2015,

after transferring 788,572 shares to Adam Krellenstein.

54)     On February 1, 2016, 2,158,318 of Dermody's Symbiont shares vested, and

Symbiont's right to repurchase those shares terminated regardless of the basis for any subsequent

termination of Dermody's employment.

55)     Dermody gave notice of his voluntary resignation from his employment with Symbiont on March 23, 2016 and his employment ended by agreement on June 1, 2016.

56)     Dermody has the absolute right to retain his vested shares of Symbiont stock.

57)     Symbiont and its Board of Directors have purported to wrongfully deem Dermody's employment to have been terminated retroactively for cause "prior to the first vesting date" for Dermody's shares, and asserted Symbiont's intent to repurchase all but 250,000 of Dermody's shares.

58)     The stated reasons for the purported retroactive termination for cause of Dermody's employment are false, fraudulent and pretextual, intended solely to wrongfully deprive Dermody of Symbiont stock that is rightfully his.

59)     The actions of Symbiont and its Board of Directors are in breach of the Agreement and of Dermody's employment agreement.

60)     The actions of Symbiont and its Board of Directors were taken in bad faith and intended to deprive Dermody of the benefit of his bargain embodied in the Agreement and Dermody's employment agreement.

61)     As a direct and proximate result of the wrongful actions of Symbiont and its Board of Directors, Dermody has suffered damages.

### SECOND COUNT
### (Conversion)

62)     Plaintiff Dermody repeats the allegations of the preceding paragraphs as if set forth here at length.

63)     Symbiont and its Board of Directors have failed and refused to issue a certificate for Dermody's vested shares of Symbiont, despite Dermody's entitlement to his shares and his request for the issuance of a certificate.

64)     Symbiont and its Board of Directors have failed and refused to pay Dermody the agreed salary increase and the agreed one-time bonus due and payable in connection with the closing of Symbiont's Series A funding round.

65)     By refusing to provide a certificate for Dermody's shares and to pay salary and bonus funds when due, Symbiont and its Board of Directors have wrongfully retained shares and funds to which they are not entitled, and deprived Dermody of the possession and benefit of his Symbiont shares and his funds.

66)     As a direct and proximate result of the wrongful actions of Symbiont and its Board of Directors, Dermody has suffered damages.

**THIRD COUNT**
**(Constructive Trust)**

67)     Plaintiff Dermody repeats the allegations of the preceding paragraphs as if set forth here at length.

68)     Dermody is entitled to possession of his Symbiont shares, his wrongfully withheld salary and his one-time $30,000.00 bonus.

69)     Symbiont has wrongfully retained Dermody's shares, his additional salary and his one-time $30,000.00 bonus.

70)     Dermody is entitled to a constructive trust over his 2,158,318 vested shares of Symbiont stock, his additional salary and his one-time $30,000.00 bonus to prevent the wrongful dissipation or transfer of Dermody's property.

**FOURTH COUNT**
**(Specific Performance)**

71)     Plaintiff Dermody repeats the allegations of the preceding paragraphs as if set forth here at length.

72)     The wrongful retention of Dermody's Symbiont shares by Symbiont and its Board

of Directors can be redressed only by the delivery of such shares to Dermody.  Accordingly, Dermody seeks specific performance of the Agreement and an order compelling turnover of 2,158,318 shares of Symbiont stock to Dermody.

**FIFTH COUNT**
**(Declaratory Judgment Pursuant to F.R.C.P. 57 and 28 U.S.C.S. § 2201)**

73)     Plaintiff Dermody repeats the allegations of the preceding paragraphs as if set forth here at length.

74)     A bona fide and justiciable controversy exists regarding the rights of Plaintiff Dermody to his 2,158,318 vested shares of Symbiont stock.

75)     A declaratory judgment would serve a useful purpose in clarifying or settling the legal issues as to the rights between Plaintiff and Defendants.

76)     A declaratory judgment would finalize the controversy between the Plaintiff and Defendants and offer relief from uncertainty.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Robert J. Dermody prays for judgment against Defendants Symbiont.io, Inc.; Caitlin F. Long; Neil Desena; Shivan Govindan; and Duncan Niederauer as follows:

A.     With respect to the First Count, for compensatory, special, incidental and consequential damages, attorneys' fees, interest and costs of suit;

B.     With respect to the Second Count, for compensatory, special, incidental and consequential damages, attorneys' fees, interest and costs of suit;

C.     With respect to the Third Count, for an order imposing a constructive trust over Dermody's 2,158,318 vested shares of Symbiont stock, and funds in an amount equal to Dermody's wrongly withheld salary, his one-time $30,000.00 bonus, and coverage of his

16

relocation expenses;

       D.      With respect to the Fourth Count, for an order for specific performance directing Symbiont and its Board of Directors to deliver Dermody's 2,158,318 vested shares of Symbiont stock to him;

       E.      With respect to the Fifth Count, for declaratory judgment that Dermody is entitled to all right, title, interest and possession in his 2,158,318 vested shares of Symbiont stock;

       F.      For such other and further relief as the Court may deem just, proper and equitable.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

s/ Arthur L. Porter, Jr.
    Arthur "Scott" L. Porter, Jr. (AP 2322)
FISCHER PORTER & THOMAS, P.C.
560 Sylvan Avenue, Suite 3061
Englewood Cliffs, NJ 07632
(201) 569-5959
(201) 871-4544 fax
aporter@fpt-law.com
*Attorneys for Plaintiff Robert J. Dermody III*